# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 8027 | **DATE** | 1/22/2002 |
| **CASE TITLE** | Banc One Financial Services, Inc., et al. vs. Advanta Mortgage Corp., USA, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 1/31/2002 at 10:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. Defendants' motion for partial summary judgment [42-1] is granted in part and denied in part; plaintiffs' motion for summary judgment [56-1] is granted in part and denied in part; plaintiffs' and defendants' motions to strike [89-1], [52-1] are denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | 3 number of notices | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | date docketed | 96 |
| | Notified counsel by telephone. | | | | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | 1/22/2002 | |
| | Copy to judge/magistrate judge. | | U.S. DISTRICT COURT CLERK | date mailed notice | |
| IS | courtroom deputy's initials | 02 JAN 22 PM 4:29 | | IS | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JAN 2 3 2002

| | | |
|---|---|---|
| **BANC ONE FINANCIAL SERVICES, INC.,** and **BANK ONE, N.A.,** | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 00 C 8027 |
| v. | ) ) | Magistrate Judge |
| **ADVANTA MORTGAGE CORP. USA,** and **ADVANTA CORPORATION,** | ) ) ) | Martin C. Ashman |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Banc One Financial Services, Inc. ("BOFS") and Bank One, N.A. ("BONA") filed this diversity suit against Advanta Mortgage Corp. USA and Advanta Corp. (collectively referred to throughout this decision as "Advanta") for breach of contract, declaratory judgment, and conversion. According to the complaint, Advanta wrongfully withdrew approximately $23 million from BONA and BOFS in violation of certain loan servicing agreements. Advanta denied any impropriety on its part and set forth twelve affirmative defenses and a counterclaim with two counts. A contention that BONA and BOFS breached the covenant of good faith and fair dealing underlain one of Advanta's affirmative defenses and part of Advanta's counterclaim. Presently before this Court are the following motions: Advanta's Motion for Partial Summary Judgment; BONA's and BOFS's Motion for Summary Judgment; BONA's and BOFS's motions to strike Advanta's allegations of breach of the implied covenant of good faith and fair dealing; and Advanta's Motion to Strike Portions of BONA's and BOFS's Responses to Advanta's

Statement of Additional Facts.[1]  For the following reasons, Advanta's Motion for Partial

Summary Judgment is granted in part and denied in part due to mootness, BOFS's Motion for

Summary Judgment is granted in part and denied in part due to mootness, and all of the other

motions are denied due to mootness.[2]


## I.  <u>Background</u>

The relationship between BOFS and Advanta began on November 1, 1996, when the

parties executed a Loan Servicing Agreement.[3]  BOFS was a financial services company that

owned certain first and second lien, fixed and adjustable rate, nonconforming residential

mortgage loans, and Advanta was a financial services company that serviced these types of loans

for itself and for third parties.  The Loan Servicing Agreement established the terms and

conditions under which Advanta was to service loans for BOFS.

The Loan Servicing Agreement was a nonexclusive agreement and had no minimal

requirements regarding the amount or number of loans that BOFS was to deliver to Advanta for

servicing.  Yet Advanta was obligated to service any loan that BOFS delivered to Advanta for

servicing.  As part of its servicing function, Advanta was to collect payments made by borrowers

---

[1]  We note that the following motions have been withdrawn: BONA's and BOFS's Motion to Dismiss Count I of Advanta's Counterclaim, and Advanta's Motion to Dismiss Claims Against Advanta Corp.  (*See* BONA's and BOFS's Reply Mem. Supp. Mot. Dismiss Count II Advanta's Countercl. at 1 n.1.)

[2]  The parties have consented to have this Court conduct any and all proceedings, including the entry of final judgment.  *See* 28 U.S.C. § 636(c); Local R. 73.1(b).

[3]  The following facts are uncontroverted.

under the terms of their loans and deposit those collections into a Collection Account.[4]  In

exchange for performing this and other servicing functions, BOFS was to pay Advanta a

servicing fee—forty basis points per annum per loan—which Advanta was to retain from the

interest portion of any loan payments.  Accrued and unpaid servicing fees, however, could be

withdrawn by Advanta from the Collection Account pursuant to Section 4.5 of the Loan

Servicing Agreement.

Section 6.2 of the Loan Servicing Agreement permitted Advanta to transfer its right to

receive servicing fees to a successor servicer, but only if BOFS gave prior written consent to the

transfer.  Section 6.15(c) permitted BOFS to "transfer[] servicing of some of the Mortgage Loans

to another servicer without terminating [the Loan Servicing Agreement]."  In that event, BOFS

was to pay Advanta fifty dollars per loan transferred.  Any expenses incurred by and

reimbursable to Advanta as a result of the transfer could be withdrawn by Advanta from the

Collection Account.

Terminations of the Loan Servicing Agreement not for cause were covered in Section

6.15(b).  Section 6.15(b) allowed either BOFS or Advanta "at any time and in its sole discretion

[to] terminate [the Loan Servicing Agreement] upon at least ninety days prior written notice to

the other party."  Section 6.15(b) continued: "if [BOFS] terminates [the Loan Servicing

Agreement], [BOFS] shall pay [Advanta] a termination fee of 0.5% of the aggregate principal

balance of the Mortgage Loans as of the last day of the related remittance period," but if

---

[4]  The Loan Servicing Agreement defined "Collection Account" as "[t]he separate trust
account or accounts, each of which shall be . . . created and maintained by [Advanta] specifically
for the collection of principal and interest, Insurance Proceeds, Liquidation Proceeds, and other
amounts received with respect to the Mortgage Loans . . . ."  (Silver Aff. Ex. A at 2.)

"[Advanta] terminates [the Loan Servicing Agreement] it shall be liable to pay all reasonable costs associated with the transfer of Mortgage Loans to a successor servicer." (Silver Aff. Ex. A at 22.) Section 4.5 permitted Advanta to withdraw from the Collection Account any expenses incurred by and reimbursable to it as a result of a termination by BOFS.

Between November 1996 and August 1999, BOFS and Advanta performed according to the terms and conditions of the Loan Servicing Agreement. BOFS's initial delivery of loans to Advanta took place around March 1997. More loans followed over time. By October 1998, Advanta was servicing a pool of loans valued at about one billion dollars. And by August 1999, the value of the pool of loans soared to approximately three billion dollars.

A corporate reorganization at Bank One in August 1999 resulted in BOFS's wholesale mortgage loan origination business being transferred to BONA effective September 1, 1999. As a result, as of September 1, 1999, BOFS could not own any new loans, which meant that BOFS no longer had the ability to transfer new loans to Advanta for servicing. Since BONA and Advanta desired to do business, they executed an Interim Loan Servicing Agreement on August 31, 1999, as a means to deal with Advanta's servicing of BONA's loans until a new servicing agreement was executed by the parties.

The Interim Loan Servicing Agreement, an agreement separate from the Loan Servicing Agreement, adopted and incorporated by reference the terms and conditions of the Loan Servicing Agreement with some exceptions. The Interim Loan Servicing Agreement mirrored the Loan Servicing Agreement in that, among other things, it was a nonexclusive agreement, it had no minimal requirements regarding the amount or number of loans that BONA was to deliver to Advanta for servicing, and it required Advanta to service any loan that BONA delivered to

Advanta for servicing. One difference between the Interim Loan Servicing Agreement and the Loan Servicing Agreement, however, was Section 6.15(c). Instead of providing BONA with the right to transfer only some of the loans, Section 6.15(c) of the Interim Loan Servicing Agreement provided that BONA could "transfer[] some or all of the Mortgage Loans to another servicer." In that event, BONA was to pay Advanta twenty-five dollars per loan transferred.

During the twelve months following the execution of the Interim Loan Servicing Agreement, BONA delivered to Advanta for servicing approximately $200 million of loans each month. By August 1, 2000, the total value of all loans being serviced by Advanta under the Interim Loan Servicing Agreement and Loan Servicing Agreement was approximately five billion dollars. Along with the growth in the pool of loans came increased servicing fees for Advanta. It also brought about periodic expressions of concern by BONA and BOFS with respect to Advanta's ability to service loans.

On August 17, 2000, Peter Silver of BONA and BOFS contacted John Berens of Advanta to inform him that BONA and BOFS had assessed their relationships with Advanta and concluded that, in light of Advanta's performance, it was BONA's and BOFS's desire to end their relationships with Advanta. Berens responded by demanding payment of termination fees pursuant to Section 6.15(b) of the Interim Loan Servicing Agreement and Loan Servicing Agreement. Silver did not accede to Berens's demand.

On August 25, 2000, Silver sent a letter to Berens. The letter began by referencing the August 17 conversation: "In that call I indicated that [BONA and BOFS] had assessed the future of [their relationships with Advanta] in light of [Advanta's] current performance on the portfolio[s] and new developments in the[ir] relationship[s], and had concluded that it was

- 5 -

[BONA's and BOFS's] desire to end the[ir] relationship[s] [with Advanta]. Advanta's response was that [BONA and BOFS were not entitled to transfer the portfolios] without payment of the termination fee[s] required by the applicable contracts." (Silver Aff. Ex. D at 1.) In the third paragraph of the letter, Silver directed Advanta to transfer to Wendover Financial Service Corporation all of the loans being serviced by Advanta under the Interim Loan Servicing Agreement by November 1, 2000, and to transfer to Wendover some of the loans being serviced by Advanta under the Loan Servicing Agreement by the same date.[5] Silver stated that the transfers were being made pursuant to Section 6.15(c) of the Interim Loan Servicing Agreement and Loan Servicing Agreement.

In accordance with Section 6.15(c) of the Interim Loan Servicing Agreement, BONA agreed to pay Advanta twenty-five dollars per loan transferred, and in accordance with Section 6.15(c) of the Loan Servicing Agreement, BOFS agreed to pay Advanta fifty dollars per loan transferred. With 38,161 loans subject to transfer under the Interim Loan Servicing Agreement and 24,796 loans subject to transfer under the Loan Servicing Agreement, Silver assessed the total transfer fee at $2,193,825.

Silver expressly stated in the August 25 letter that BONA was not terminating the Interim Loan Servicing Agreement for cause pursuant to Section 6.4. Silver threatened that BOFS would terminate the Loan Servicing Agreement for cause if Advanta failed to correct

---

[5] BOFS allowed approximately one billion dollars' worth of ARM and balloon loans to remain with Advanta. According to Advanta, these loans were the least profitable to service.

twelve purported performance deficiencies within thirty days. Silver listed all twelve deficiencies on an exhibit that was attached to his letter.[6]

On August 31, 2000, Advanta's counsel, Jay Dubow, responded to Silver's August 25 letter. Dubow accused Silver of falsely charging Advanta with poor performance and characterized Silver's letter as a "failed attempt at trying to 'transfer' the Mortgage Loans pursuant to Section 6.15(c) of the [Interim Loan Servicing Agreement and Loan Servicing Agreement]." (Silver Aff. Ex. E at 1.) Dubow explained that Advanta never agreed to service loans according to the standards listed on Silver's exhibit so BOFS had no right to hold Advanta to those standards. Dubow then declared that Advanta rejected Silver's labeling of the transfers as being made pursuant to Section 6.15(c) of the Interim Loan Servicing Agreement and Loan Servicing Agreement. Instead, Advanta deemed the transfers as being made pursuant to Section 6.15(b) of the agreements due to Silver's statements in the August 25 letter. Dubow closed the letter with a request for the name of a successor servicer and a demand for termination fees.

BONA's and BOFS's counsel, William Gibbons, responded to Dubow by stating that Silver intended to transfer all of the loans pursuant to Section 6.15(c) of the Interim Loan Servicing Agreement and Loan Servicing Agreement. Nonetheless, BONA and BOFS agreed to accept Advanta's transfer of all of the loans to Wendover. As Gibbons pointed out, Advanta possessed the right to transfer all of the loans pursuant to Section 6.15(b) of the Interim Loan Servicing Agreement and Loan Servicing Agreement.

---

[6] The alleged deficiencies ranged from Advanta's timing of collection efforts to Advanta's calling strategy. (Silver Aff. Ex. D at 4.)

On December 1, 2000, Advanta transferred to Wendover all of the loans that Advanta had been servicing under the Interim Loan Servicing Agreement and Loan Servicing Agreement as per BONA's and BOFS's instructions. Following the transfer, Advanta withdrew approximately $25 million from the Collection Accounts for payment of termination fees, unbeknownst to BONA and BOFS, both of whom, as mentioned above, had previously informed Advanta that it was not entitled to termination fees.

This withdrawal from the Collection Accounts by Advanta prompted BONA and BOFS to file suit in federal court on December 21, 2000. BONA's and BOFS's later filed Second Amended Complaint contained one count for breach of contract, two counts for declaratory judgment, and one count for conversion. All of the counts attacked Advanta's claim to termination fees, which Advanta fervidly defended with an answer containing twelve affirmative defenses and a counterclaim with two counts.

On July 27, 2001, after conducting some discovery, Advanta filed a Motion for Partial Summary Judgment, asking for rulings on whether BONA terminated the Interim Loan Servicing Agreement and on whether Advanta had the right to withdraw the disputed termination fee from the Collection Account pursuant to Section 4.5 of the Interim Loan Servicing Agreement. A month later, BONA and BOFS filed a Motion to Dismiss Count II of Advanta's Counterclaim, which alleged a breach of the implied covenant of good faith and fair dealing under the Interim Loan Servicing Agreement and Loan Servicing Agreement, as well as a Motion to Strike Advanta's Ninth Affirmative Defense, which alleged the same. In October 2001, BONA and BOFS filed a Motion for Summary Judgment, asking for rulings on whether Advanta terminated the Interim Loan Servicing Agreement and Loan Servicing Agreement, and on whether Advanta

had the right to withdraw disputed termination fees from the Collection Accounts pursuant to Section 4.5 of the Interim Loan Servicing Agreement and Loan Servicing Agreement. Lastly, on December 10, 2001, Advanta filed a Motion to Strike BONA's and BOFS's Responses to Advanta's Statement of Additional Facts. All of the motions have been fully briefed and argued. We now address the pertinent issues, beginning with those contained in the motions for summary judgment.

## II. Discussion

### A. Standard of Review

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is a fact that may affect the outcome of a claim under the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue as to a material fact exists only if there is sufficient evidence for a jury to return a verdict in favor of the nonmoving party. *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 905 (7th Cir. 1990). In determining whether a genuine issue of material fact exists, the court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999).

Both parties acknowledge that summary judgment is often an appropriate method of resolving contract disputes. Where resolution of the dispute involves the application of

undisputed facts to an unambiguous contract, there is no need to present the case to a jury. Contract interpretation is a question of law. *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 564-65 (7th Cir. 1995); *Samuels v. Wilder*, 871 F.2d 1346, 1351 (7th Cir. 1989).

**B.  Advanta's Motion for Partial Summary Judgment: The Interim Loan Servicing Agreement**

Advanta's Motion for Partial Summary Judgment is directed exclusively at BONA's claims for damages and declaratory relief under the Interim Loan Servicing Agreement. Advanta contends that this Court should find, as a matter of law, that Advanta was entitled to the termination fee pursuant to Section 6.15(b) of the Interim Loan Servicing Agreement because BONA terminated the agreement, and that Advanta properly withdrew the termination fee from the Collection Account because Section 4.5 of the Interim Loan Servicing Agreement provided it with such a right. In response, BONA submits that it did not terminate the Interim Loan Servicing Agreement as a matter of law because BONA exercised only its express right to transfer loans pursuant to Section 6.15(c) and because BONA retained an option to deliver new loans to Advanta in the future. BONA accuses Advanta of attempting to magically transform BONA's transfer into a termination of the Interim Loan Servicing Agreement to obtain the more alluring termination fee. BONA also challenges Advanta's interpretation of Section 4.5.

The fundamental goal of contract interpretation is to give effect to the mutual intent of the parties at the time of contracting. Cal. Civ. Code § 1636 (West 2001). Under California law, which the parties agree governs this case, the mutual intent of the parties is to be ascertained from the contract alone, assuming that the evidence presented to the court does not expose any

ambiguity in the language of the contract. *Morey v. Vannucci*, 75 Cal. Rptr. 2d 573, 578 (Cal. Ct. App. 1998); *Shaw v. Regents of the Univ. of Cal.*, 67 Cal. Rptr. 2d 850, 855 (Cal. Ct. App. 1997); *General Motors Corp. v. Superior Court*, 15 Cal. Rptr. 2d 622, 626-27 (Cal. Ct. App. 1993). The court must interpret the words of the contract in their ordinary and popular sense. Cal. Civ. Code § 1644. And the court must interpret the contract as a whole, giving effect to each and every part. *Id.* § 1641.

As an initial matter, we note that, for purposes of deciding Advanta's motion, the only relevant pool of loans is the pool of loans that Advanta serviced under the Interim Loan Servicing Agreement. BONA and Advanta created the Interim Loan Servicing Agreement as an agreement separate from the Loan Servicing Agreement, and BOFS was not a party to the Interim Loan Servicing Agreement. (Silver Aff. Ex. B at 1.) As such, we need only direct attention to BONA's actions with respect to the pool of loans that Advanta serviced under the Interim Loan Servicing Agreement. Those actions determine whether BONA terminated the Interim Loan Servicing Agreement.

The first issue raised in Advanta's motion—whether BONA terminated the Interim Loan Servicing Agreement on August 25—involves the interpretation of Section 6.15(b) and Section 6.15(c) of the Interim Loan Servicing Agreement. Section 6.15(b) states that BONA "may, at any time and in its sole discretion, terminate [the Interim Loan Servicing Agreement] upon at least ninety days prior written notice to [Advanta]; provided if [BONA] terminates [the Interim Loan Servicing Agreement], [BONA] shall pay [Advanta] a termination fee . . . ." (Silver Aff. Ex. A at 22.) Section 6.15(c), on the other hand, states that if BONA "transfers servicing of some or all of the Mortgage Loans [from Advanta] to another servicer, [BONA] shall pay to

[Advanta] $25.00 per Mortgage Loan transferred." (*Id.* Ex. B at 2.) We conclude that the language in both sections is unambiguous, neither party has presented any evidence or argument to suggest otherwise.

Section 6.15(b) contains a word and a phrase that need elaboration. The word is terminate. Terminate means "to put an end to" or "to bring to an end or a halt." Black's Law Dictionary 1471 (6th ed. 1990); Webster's II New Riverside University Dictionary 1194 (1994). The phrase is Interim Loan Servicing Agreement. Interim Loan Servicing Agreement, as used in Section 6.15(b), means all of the enforceable obligations between BONA and Advanta, as we explain more fully below.

The Interim Loan Servicing Agreement represents, at most, an agreement between BONA and Advanta establishing the terms and conditions that would apply if and when BONA delivered a loan to Advanta for servicing. Upon execution of the Interim Loan Servicing Agreement, BONA had no obligation to deliver a single loan to Advanta for servicing. Advanta had no obligation to request a single loan from BONA. The Interim Loan Servicing Agreement did obligate Advanta to service any loan delivered to it by BONA in exchange for a fee; however, it was within the sole discretion of BONA to deliver a loan to Advanta in the first place.

In contract parlance, the Interim Loan Servicing Agreement amounted to a negotiated and agreed standing offer by Advanta that invited acceptance by BONA in the form of performance, i.e., delivery of a loan. *See Sharp Elecs. Corp. v. Deutsche Fin. Servs. Corp.*, 216 F.3d 388, 393-94 (4th Cir. 2000); *see also Asmus v. Pacific Bell*, 999 P.2d 71, 75 & n.4 (Cal. 2000). The offer was a standing offer in the sense that it proposed to create enforceable obligations between BONA and Advanta from time to time. Each time BONA accepted Advanta's offer by delivering

- 12 -

a loan, enforceable obligations formed between BONA and Advanta with regard to the servicing of that loan.

Since the mere execution of the Interim Loan Servicing Agreement did not give rise to any enforceable obligations between BONA and Advanta, at the time of execution either party could have freely withdrawn from the Interim Loan Servicing Agreement. BONA could have remained still, not delivering a single loan to Advanta for servicing, or BONA could have made a counteroffer, rejecting Advanta's standing offer. *See* Restatement (Second) of Contracts § 36 (1981). In comparison, Advanta could have revoked its standing offer, informing BONA that Advanta no longer desired to create any enforceable obligations. *Id.* However, as explained above, this freedom from obligation lasted only until BONA delivered a loan to Advanta for servicing. At that time, BONA accepted Advanta's offer and bound Advanta to the terms and conditions of the Interim Loan Servicing Agreement. Delivery of the loan also bound BONA to the terms and conditions of the Interim Loan Servicing Agreement. On both sides, enforceable obligations formed.[7] *Id.* §§ 53(1), 54(1).

Section 6.15(b) of the Interim Loan Servicing Agreement comes into play at the moment when BONA puts an end to all of the enforceable obligations between it and Advanta. We interpret the phrase Interim Loan Servicing Agreement in Section 6.15(b) in this fashion to emphasize that a termination of Advanta's standing offer, as represented by the Interim Loan

---

[7] This arrangement between BONA and Advanta resembles the arrangement between credit card companies and their potential customers. The company makes an offer to finance the customer's purchases; the customer accepts the offer by making a purchase with the credit card. Until the customer uses the credit card, the company may revoke its offer. But once a customer uses the credit card to make a purchase, the company becomes obligated to finance that purchase. *See Sharp Elecs. Corp.*, 216 F.3d at 393-94 (citing *Garber v. Harris Trust & Sav. Bank*, 432 N.E.2d 1309, 1311-13 (Ill. App. Ct. 1982)).

Servicing Agreement, could not trigger the application of Section 6.15(b). After all, Advanta had no enforceable right to compel BONA to accept the standing offer and BONA had no enforceable right to compel Advanta to continue the standing offer. We find that Section 6.15(b) contemplates an end to all of the enforceable obligations between BONA and Advanta, rather than some, in light of Section 6.15(b)'s formula to calculate the termination fee—one-half of one percent of the aggregate principal balance of the loans—and of BONA's express right to transfer loans to another servicer pursuant to Section 6.15(c).

By ordering a transfer of all of the loans on August 25, we hold that BONA did, in fact, terminate the Interim Loan Servicing Agreement. BONA put an end to all of the enforceable obligations between it and Advanta, leaving Advanta with no servicing function to perform under the Interim Loan Servicing Agreement. It is impossible to conceive of any further terminating act that would have added any more conclusive, final, or effective end to the enforceable obligations between BONA and Advanta under the Interim Loan Servicing Agreement.

BONA argues that this interpretation of Section 6.15(b) renders meaningless BONA's express right to transfer all of the loans pursuant to Section 6.15(c). We disagree. Section 6.15(c) provides BONA with the right to transfer loans on condition that the transfer is not equivalent to a termination of the enforceable obligations between it and Advanta. Section 6.15(c) would apply if BONA ordered the transfer of some of the loans. Section 6.15(c) would also apply if BONA ordered the transfer of all of the loans with a concurrent delivery of new loans. In neither of these two situations could BONA be deemed to have put an end to the enforceable obligations between it and Advanta. At all times, enforceable obligations would exist.

The interpretation we advance considers the whole of the Interim Loan Servicing Agreement, giving effect to every part of the agreement. Section 6.15(b) applies where the transfer puts an end to the enforceable obligations between BONA and Advanta, while Section 6.15(c) applies to anything short of that.[8] BONA's interpretation, too dependent on the label of a transfer rather than the substance of one, fails to give effect to every part of the Interim Loan Servicing Agreement by effectively rubbing out the line between Section 6.15(b) and Section 6.15(c).

We have considered BONA's argument that its transfer of all of the loans did not put an end to the Interim Loan Servicing Agreement because BONA retained the option to deliver loans to Advanta in the future. In our view, this option did not exist after at least Advanta's receipt of Silver's August 25 letter as Silver, on behalf of BONA, rejected Advanta's standing offer to service loans. *See* Restatement (Second) of Contracts §§ 38, 40. In no uncertain terms, Silver stated that BONA "had concluded that it was [BONA's] desire to end [its] relationship" with Advanta. (Silver Aff. Ex. D at 1.) BONA had no intention to do further business with Advanta at that time. (Silver Aff. ¶ 20.) Thus, it was reasonable for Advanta to change its position in reliance on Silver's letter. *See* Restatement (Second) of Contracts § 38 cmt. a.

In any event, even if BONA had retained the option to deliver loans, it would not affect our decision. We hold that Section 6.15(b) applies because BONA put an end to the enforceable obligations between the parties. Since the mere existence of Advanta's standing offer did not create enforceable obligations between it and BONA—only BONA's actual delivery of loans

---

[8] We agree with BONA that a transfer could not fall within the scope of both Section 6.15(b) and Section 6.15(c).

did—a finding that BONA could still accept Advanta's standing offer would not preclude a finding that BONA terminated the enforceable obligations between it and Advanta.[9]

\* \* \*

The remainder of Advanta's Motion for Partial Summary Judgment deals with whether Section 4.5 of the Interim Loan Servicing Agreement permitted Advanta to withdraw the termination fee from the Collection Account. We need not address this issue, however, because the issue is rendered moot by the conclusion that BONA terminated the Interim Loan Servicing Agreement. Since we conclude that Advanta owned the disputed funds prior to the commencement of this suit, it is not necessary to determine who had the right to hold the disputed funds during this suit. (*See* Advanta's Reply Br. at 14 n.9 (pointing out that a decision on this issue would not affect the outcome of this case).) Accordingly, we deny this portion of Advanta's motion.

### C. BOFS's Motion for Summary Judgment: The Loan Servicing Agreement

With the issues surrounding the Interim Loan Servicing Agreement resolved, we shift the focus of this decision to the Loan Servicing Agreement. In its Motion for Summary Judgment, BOFS asserts that it properly exercised its express right to transfer "some of the loans" on August 25 as a matter of law. The transfer did not terminate the Loan Servicing Agreement, BOFS argues, because the transfer did not end the relationship between BOFS and Advanta—over one billion dollars' worth of loans remained with Advanta for servicing. BOFS

---

[9] Conversely, a finding that BONA rejected Advanta's standing offer would not necessarily lead to a finding that BONA terminated the Interim Loan Servicing Agreement.

claims that it was Advanta, not BOFS, that terminated the Loan Servicing Agreement by virtue of Advanta's August 31 letter. Finally, BOFS contends that Section 4.5 of the Loan Servicing Agreement did not provide Advanta with the right to withdraw the disputed termination fee.

Advanta acknowledges that the August 25 letter directed the transfer of some of the loans under the Loan Servicing Agreement, but proffers that other portions of the letter cast serious doubt on whether a mere transfer occurred. Particularly, Advanta argues that Silver's statement that BOFS "had concluded that it was [BOFS's] desire to end the [BOFS/Advanta] relationship," and Silver's threat that BOFS would terminate the Loan Servicing Agreement for cause if Advanta failed to correct certain performance deficiencies within thirty days, raise at least an issue of fact as to whether BOFS's August 25 letter actually or constructively terminated the Loan Servicing Agreement. In any event, Advanta claims that it has raised a genuine issue of fact as to whether BOFS's transfer of some of the loans breached the implied covenant of good faith and fair dealing; this alone should preclude summary judgment.[10]

Much of our analysis in the preceding section applies here due to the similarities between the Interim Loan Servicing Agreement and Loan Servicing Agreement. For instance, we find the Loan Servicing Agreement to be nothing more than an agreement between BOFS and Advanta

---

[10] We will treat BOFS's motions to strike Advanta's allegations of breach of the implied covenant of good faith and fair dealing as motions for summary judgment and apply the standard for summary judgment delineated earlier in this decision. Both BOFS and Advanta have submitted statements of fact and supporting materials in accordance with Local Rule 56.1 on this issue. And both BOFS and Advanta have included case law and argument on this issue in their summary judgment briefs. *See Marco Holding Co. v. Lear Siegler, Inc.*, 606 F. Supp. 204, 212-13 (N.D. Ill. 1985). Additionally, we note that additional discovery would not assist Advanta in opposing BOFS's Motion for Summary Judgment. (*See* Advanta's Mem. Opp'n BOFS's Mot. Summ. J. at 26-27 (requesting time to conduct additional discovery pursuant to Rule 56(f)).)

establishing the terms and conditions that would apply if and when BOFS delivered a loan to Advanta for servicing. It amounted to a negotiated and agreed standing offer by Advanta that proposed to create enforceable obligations between it and BOFS each time BOFS delivered a loan. Our previous interpretation of Section 6.15(b) also applies here, as Section 6.15(b) of the Loan Servicing Agreement is identical to Section 6.15(b) of the Interim Loan Servicing Agreement. Hence, if we were to find that BOFS put an end to all of the enforceable obligations between it and Advanta, then we would find that BOFS terminated the Loan Servicing Agreement pursuant to Section 6.15(b). The only new ground we tread is Section 6.15(c) of the Loan Servicing Agreement. It states that "if [BOFS] transfers servicing of some of the Mortgage Loans to another servicer without terminating [the Loan Servicing Agreement], [BOFS] shall pay to [Advanta] $50.00 per Mortgage Loan transferred." (Silver Aff. Ex. A at 22.) We point out that none of the pertinent sections of the Loan Servicing Agreement are ambiguous, again neither party has presented any evidence or argument to show otherwise.

Determining whether BOFS actually terminated the Loan Servicing Agreement pursuant to Section 6.15(b) is quite simple, using the principles previously stated. On August 25, BOFS ordered the transfer of only some of the loans, leaving over one billion dollars' worth of loans with Advanta for servicing. As to the remaining loans, BOFS and Advanta had enforceable obligations between them. At the most basic level, Advanta was to service the loans and BOFS was to pay Advanta a servicing fee. Due to the existence of these enforceable obligations, we find that, as a matter of law, BOFS did not actually terminate the Loan Servicing Agreement on August 25.

The fact that on August 25 BOFS informed Advanta that BOFS "[would] terminate the [Loan Servicing Agreement for cause] if Advanta fail[ed] to correct [certain] performance deficiencies . . . with respect to the remaining ARM and balloon loans within thirty days after receipt of this Notice" does not help Advanta's case, even assuming that Advanta had never agreed to the performance standards, and even assuming that Advanta could not have complied with the performance standards. At most, this statement represents a threat to terminate the Loan Servicing Agreement, not a call to terminate the Loan Servicing Agreement as of August 25. The two are not the same. The fact that Silver stated on August 25 that BOFS "had concluded that it was [BOFS's] desire to end the [BOFS/Advanta] relationship" does not help Advanta's case, either. Notwithstanding this expression of desire, or any secret desires existing at the time, it cannot be disputed that BOFS and Advanta had enforceable obligations between them under the Loan Servicing Agreement at least until August 31. On August 25, BOFS did not order Advanta to transfer the ARM and balloon loans. Therefore, BOFS cannot be said to have actually put an end to the Loan Servicing Agreement at that time.

Nor can we conclude that BOFS constructively terminated the Loan Servicing Agreement on August 25, as Advanta contends. The concept of constructive termination recognizes that a party to a contract can engage in conduct that results in a termination of the contract even though the conduct itself does not actually terminate the contract. It applies where one party unilaterally modifies the terms of the parties' contractual relationship if the modification substantially interferes with the other party's ability to obtain the benefits of the contract. *See Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1183 (2d Cir. 1995) (involving a manufacturer who unilaterally modified the territories of its distributors). It also applies where one party unilaterally imposes

- 19 -

conditions so intolerable that the other party has no option but to resign. *See Turner v.*

*Anheuser-Busch, Inc.*, 876 P.2d 1022, 1244-45 (Cal. 1994) (involving an employer who allegedly

harassed an employee).

Advanta relies on the following facts to support its constructive termination argument: the

August 25 letter drastically changed the nature and value of the portfolio, as BOFS left Advanta

to service only the least profitable loans; and the August 25 letter imposed new conditions on

Advanta, to which it never agreed, and with which it could not have complied in thirty days as

required by BOFS. But even if the August 25 letter drastically changed the nature and value of

the loan portfolio, we fail to see how this was equivalent to a termination of the Loan Servicing

Agreement. BOFS did not interfere with Advanta's ability to obtain any benefit that it was

entitled to under the Loan Servicing Agreement. For according to the terms of Advanta's offer,

as represented by the Loan Servicing Agreement, BOFS had the right to transfer some of the

loans and thereby change the nature and value of the loan portfolio as it pleased. Likewise, we

fail to see how the new conditions could serve as a basis for finding a constructive termination.

Advanta has presented no evidence to show that the conditions interfered with Advanta's ability

to obtain the benefits that it was entitled to under the Loan Servicing Agreement, and Advanta

has presented no evidence to show that the conditions prevented Advanta from performing under

the Loan Servicing Agreement. From what we can tell, BOFS never took any action to interfere

with Advanta's ability to service the ARM and balloon loans. And BOFS never refused to pay

Advanta a servicing fee with respect to those loans. So we cannot discern how the conditions

proposed by BOFS could have "effectively forced Advanta to resign." (Advanta's Mem. Opph

BOFS's Mot. Summ. J. at 14.)

Turning to Advanta's final argument, we agree with BOFS that its August 25 transfer did not breach the implied covenant of good faith and fair dealing as a matter of law, even assuming that the transfer was part of a device to avoid paying Advanta a termination fee. Under California law, every contract contains an implied covenant of good faith and fair dealing to prevent either party from unfairly frustrating the other party's right to receive the benefits of the contract actually made. *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1110 (Cal. 2000). As the implied covenant only protects the express terms of the contract, it "cannot 'be endowed with an existence independent of its contractual underpinnings.'" *Id.* (quoting *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 639 (Cal. 1995)). Furthermore, "[i]t cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.* Indeed, where a specific act is authorized by the express terms of the contract, no implied covenant of good faith and fair dealing can be read into the contract to forbid that act, even if the act would otherwise have been forbidden by an implied covenant of good faith and fair dealing. *EPIS, Inc. v. Fidelity & Guar. Life Ins. Co.*, 156 F. Supp. 2d 1116, 1127-28 (N.D. Cal. 2001); *Guz*, 8 P.3d at 1109-11; *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 727-29 (Cal. 1992); *Third Story Music, Inc. v. Waits*, 48 Cal. Rptr. 2d 747, 753 (Cal. Ct. App. 1996).

Here, Advanta seemingly argues that an implied covenant should be read into Section 6.15(c) of the Loan Servicing Agreement to preclude BOFS from using Section 6.15(c) to transfer some of the loans for the purpose of avoiding a more expensive termination fee. The downfall of Advanta's argument—even assuming that BOFS actually used Section 6.15(c) to avoid paying the more expensive Section 6.15(b) termination fee—is the express language of

Section 6.15(c) itself. Section 6.15(c) unambiguously provides BOFS with a very broad right to transfer some of the loans to another servicer without terminating the Loan Servicing Agreement—and therefore without paying a termination fee. (Silver Aff. Ex. A at 22.) Section 6.15(c) transfers are not limited in frequency, value, or number of loans per transfer (besides being only some loans). Nor are Section 6.15(c) transfers limited in any other relevant way. Section 6.15(c) does not even require BOFS to give a reason for ordering a transfer.

To read into the Loan Servicing Agreement an implied covenant placing limitations on BOFS's right to transfer some of the loans, as Advanta asks this Court to do, would require this Court to place limits on BOFS's right to transfer some of the loans beyond the limits to which the parties actually agreed. It would require this Court to obliterate BOFS's Section 6.15(c) right as it is expressly stated in the Loan Servicing Agreement. The California courts are clear: "No obligation can be implied . . . which would result in the obliteration of a right expressly given under a written contract." *Gerdlund v. Electronic Dispensers Int'l*, 235 Cal. Rptr. 279, 286 (Cal. Ct. App. 1987). Consequently, Advanta's ninth affirmative defense and part of its counterclaim must fall. *See Guz*, 8 P.3d at 1112.

We recognize that Advanta frames this argument as one to protect its right to a Section 6.15(b) termination fee. (*See* Advanta's Mem. Law Opp'n Mot. Dismiss Countercl. at 13-15.) But precisely because Section 6.15(c) allows BOFS to transfer some of the loans without limitation and without terminating the Loan Servicing Agreement, BOFS does not frustrate Advanta's right to a termination fee merely by doing so. Thus, Advanta cannot preclude BOFS from using Section 6.15(c) to lessen a subsequent termination fee under Section 6.15(b) because

Advanta never provided itself with any such actual benefit under the Loan Servicing Agreement in the first place. *See Guz*, 8 P.3d at 1110.

In the end, we hold that, as a matter of law, Advanta terminated the Loan Servicing Agreement by virtue of its August 31 letter. In the letter, Advanta informed BOFS that Advanta was transferring all of the loans to another servicer as per BOFS's instruction, thereby putting an end to all of the enforceable obligations between the parties. As explained above, by putting an end to all of the enforceable obligations between the parties, Advanta terminated the Loan Servicing Agreement.

\* \* \*

The remainder of BOFS's Motion for Summary Judgment, which deals with whether Section 4.5 of the Loan Servicing Agreement permitted Advanta to withdraw the disputed termination fee from the Collection Account, is rendered moot by this Court's conclusion that Advanta, not BOFS, terminated the Loan Servicing Agreement. Since we conclude that BOFS owned the disputed funds prior to the commencement of this suit, it is not necessary to determine who had the right to hold the disputed funds during this suit. Accordingly, we deny this portion of BOFS's motion.

### III. Conclusion

For the reasons stated, this Court grants Advanta's Motion for Partial Summary Judgment as to whether BONA terminated the Interim Loan Servicing Agreement, and this Court grants BOFS's Motion for Summary Judgment as to whether Advanta terminated the Loan Servicing Agreement. The parties' motions for summary judgment on the applicability of Section 4.5 are

moot due to the preceding conclusions. BOFS's motions to strike Advanta's allegations of breach of the implied covenant of good faith and fair dealing are moot. The motions have been treated herein as motions for summary judgment. Advanta's Motion to Strike Portions of BONA's and BOFS's Responses to Advanta's Statement of Additional Facts is denied as moot because this Court has not relied on any of the pertinent information.

As this memorandum opinion and order only decides issues relating to liability, the parties are hereby given notice that issues relating to damages, interest, etc., will be addressed in open court at the next status hearing.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** January 22, 2002.

Copies have been mailed to:

WILLIAM J. GIBBONS, Esq.    RAYMOND E. STACHNIK, Esq.
STEPHEN A. SWEDLOW, Esq.   Connelly, Roberts & McGivney, L.L.C.
B. JOHN CASEY, Esq.      One North Franklin Street
Latham & Watkins       Suite 1200
233 South Wacker Drive    Chicago, IL 60606
Suite 5800, Sears Tower
Chicago, IL 60606       JAY A. DUBOW, Esq.
             PATRICK MATUSKY, Esq.
             ANNE C. SINGER, Esq.
             Wolf, Block, Schorr & Solis-Cohen, L.L.C.
             1940 Route 70 East
             Cherry Hills, NJ 08003


Attorneys for Plaintiffs     Attorneys for Defendants